# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON
### Assigned on Briefs December 2, 2014

## STATE OF TENNESSEE v. ASHLEY BRADSHAW

### Appeal from the Criminal Court for Shelby County
### No. 12-04854    J. Robert Carter, Jr., Judge

### No. W2014-00175-CCA-R3-CD  - Filed February 9, 2015

Appellant, Ashley Bradshaw, was convicted by a jury of three counts of aggravated child abuse, three counts of aggravated child neglect, and three counts of aggravated child endangerment.  The trial court merged the convictions into one count of aggravated child abuse and sentenced appellant to twenty years in the Tennessee Department of Correction. On appeal, appellant argues that the evidence was insufficient to support her convictions. Following our review, we affirm the judgment of the trial court but remand for the trial court to clarify on the judgment sheets that the judgments have been merged into the first count.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed;
Case Remanded**

ROGER A. PAGE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined.  JAMES CURWOOD WITT, JR., J., filed a separate concurring opinion.

Stephen C. Bush, District Public Defender; and Harry E. Sayle III (on appeal), Nigel Lewis (at trial), Donna Armstard (at trial), and Benjamin Rush (at trial), Assistant District Public Defenders, Memphis, Tennessee, for the appellant, Ashley Bradshaw.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jennifer Nichols and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Facts

This case stems from the injuries received by S.B.[1] on April 26, 2012. A Shelby County grand jury indicted appellant, S.B.'s mother, for three counts of aggravated child abuse, three counts of aggravated child neglect, and three counts of aggravated child endangerment. The three counts of each offense reflect three alternate theories for the aggravating factor: that the victim received serious bodily injury; that a deadly weapon was used; and that the act of abuse/neglect was "especially heinous, atrocious or cruel, or involved the infliction of torture to the victim." Tenn. Code Ann. § 39-15-402(a)(1)-(3).

At appellant's September 2013 trial, Memphis Police Officer Gregory Turner testified that he was dispatched to LeBonheur Children's Hospital on April 26, 2012, for a child abuse call. The complainant was a social worker, Regina Morris, who reported that the two- or three-year-old victim had blisters on her vaginal area, leg, and buttocks and also had possible burns. When Officer Turner arrived, the hospital staff had already dressed the victim's injuries. Officer Turner testified that appellant was in the victim's room, and he asked her what happened. Appellant told Officer Turner that she had placed the victim "in the tub to take a bath" and that she left the room for five minutes, returning when "she heard a loud yelling and screaming from the tub." Appellant told him that the victim "had turned on the hot water and scalded herself." Appellant removed the victim from the tub and took her to LeBonheur. Officer Turner testified that appellant was initially calm but that when officers asked her to leave the victim's room, "she became kind of irate and stat[ed] to officers that she didn't want to talk anymore and [they] need[ed] to leave her alone."

On cross-examination, Officer Turner testified that he also spoke to Kelvin Arnold, Jr., (later identified as appellant's boyfriend) while he was at LeBonheur and that Mr. Arnold reported the same scenario as appellant.

Memphis Police Officer Jeffrey Alan Garey, a crime scene investigator, testified that he was dispatched to LeBonheur on April 26, 2012, to take pictures in a possible child abuse case. When he entered the victim's room, she "was laying [sic] on her back, appeared to be in distress[,] and she was heavily bandaged and had a few tubes in her." The bandages were around her waist, genital area, and lower legs. Officer Garey asked a nurse to remove the bandages so that he could photograph the injuries. However, because the removal of the bandages caused the victim pain and distress, the nurse stopped the bandage removal. Officer Garey proceeded to take photographs of the injuries he could see. Officer Garey

---

[1] It is the policy of this court to protect the privacy of minor victims by using their initials.

characterized the injuries as "severe water blisters." He testified that he also saw "welt marks" on the victim's thighs, which he photographed as well. The photographs he took of S.B. were published to the jury.

Memphis Police Officer Sam Blue, a crime scene investigator, testified that an investigating officer sent him to the residence where the victim was injured to take measurements and photographs. Officer Blue testified that the bathtub at the residence measured five feet long, two and a half feet wide, and eleven inches deep. He measured the water temperature after running the water for thirty seconds and found that the water was 100 degrees. He drained the tub and ran the water for sixty seconds, after which the water was 118 degrees. Officer Blue said he attempted to take a photograph of the water heater's gauge but because of the location of the water heater, he could only photograph the gauge from its side and could not determine with certainty the gauge's setting.

Memphis Police Lieutenant Myron Lawrence testified that when he first encountered the victim, she was in the emergency room of LeBonheur. She was lying on a bed, sedated and being cared for by nurses. Her mother (appellant) and her mother's boyfriend were also in the room. He talked to appellant about what happened, and appellant said that she had placed the victim in the bathtub, left for five minutes, and returned after hearing the victim scream. Appellant told Lieutenant Lawrence that she removed the victim from the bathtub and took her to LeBonheur. Lieutenant Lawrence testified that he asked appellant and appellant's boyfriend to leave the room when the crime scene officer arrived to take pictures because the nurse said that they had "to limit the child's exposure" by having fewer people in the room. Appellant "became irate" and "[b]egan to curse." Appellant said that the police would "have to take [her] to jail." After appellant left the room, the nurse showed the victim's injuries to Lieutenant Lawrence and the crime scene officer. Lieutenant Lawrence said that the victim had "severe burns on her lower extremities[,] [g]enital area[], [and] buttock area[]." She also had "several of what appear[ed] to [Lieutenant Lawrence] from [his] experience to be belt loop mark[s] healed up." After the crime scene officer took pictures, Lieutenant Lawrence talked to appellant again. Because she was still "irate," Lieutenant Lawrence asked her whether she had any mental problems. Appellant responded that she had been diagnosed with depression. Lieutenant Lawrence asked a Crisis Intervention Team officer to talk to appellant, and the officer "concluded that she did not meet the criteria to be transported to the mental institution." Lieutenant Lawrence again attempted to communicate with appellant but was unable to do so because she remained "too irate for [him] to even speak to her." At that point, Lieutenant Lawrence asked the Department of Children's Services ("DCS") to become involved. A DCS worker came to the hospital and took custody of the victim and the victim's brother.

-3-

Lieutenant Lawrence testified that the next step in the investigation was the procurement of a search warrant for the residence where the victim was injured. Lieutenant Lawrence went with Officer Blue to take photographs and measurements at the residence. Lieutenant Lawrence said that he reviewed Dr. Karen Lakin's report when it became available. The report indicated that the victim's injuries were inconsistent with appellant's version of events. After discussing the case with an assistant district attorney general, Lieutenant Lawrence arrested appellant.

On cross-examination, Lieutenant Lawrence testified that the decision to arrest appellant was made on May 10, 2012, and that he and Officer Blue went to the residence where the victim was injured on May 14, 2012.

Latisha Garcia testified that she was the victim's primary nurse at LeBonheur while the victim was in the emergency department. Ms. Garcia testified that the victim had "severe burns to her lower extremities and to her buttocks area and her vaginal area." Ms. Garcia said that she administered "a tremendous amount of pain medication" to the victim but that "[i]t was extremely hard to control her pain." Ms. Garcia also gave the victim an intravenous drip for fluids, dressed her injuries, covered her in a blanket for warmth, and inserted a catheter. She explained that the victim was able to verbalize that she needed to urinate but would not urinate on her own, thus requiring Ms. Garcia to catheterize her. When she inserted the catheter, she discovered that the victim also had "additional injuries . . . on the inside of the vaginal area." Ms. Garcia recalled that appellant was in the room and that she encouraged appellant to "be with [the victim] and touch her" and "talk to her," but appellant did not do so. Ms. Garcia testified that appellant told the victim to be quiet on several occasions. Ms. Garcia told appellant that the victim was in pain, but according to Ms. Garcia, appellant did not appear distressed that her child was in pain. Ms. Garcia testified that she was present when police officers came to photograph the victim's injuries. She began removing the victim's dressings, but "the skin started to come off with the dressing." They decided to stop taking pictures because removing the dressings "hurt [the victim] so much." Ms. Garcia explained that her treatment of the victim ceased after the victim was admitted into the hospital, but she knew that the victim would receive a debridement treatment — "[e]ssentially, a scrubbing of the skin" — each day. Ms. Garcia testified that the debridement procedure was so painful that patients had to be sedated. Ms. Garcia said that the hospital's social workers were always called in when a child came to the hospital with burns. The social workers were responsible for contacting DCS if necessary.

On cross-examination, Ms. Garcia testified that when she first encountered the victim, she noticed the victim's reddened skin; blisters had not yet formed. Ms. Garcia agreed that the victim was brought to the hospital soon after being burned but that because blisters form at different rates, she could not give a specific time frame for the time between the victim's

being burned and her arrival at the hospital. Ms. Garcia said that she did not notice other marks on the victim at that time. She only saw the victim one other time, the following day, and no one else was with the victim at that time.

On re-direct examination, Ms. Garcia testified that while she did not see any marks on the victim when she first saw her, she later saw "loop marks" that followed a "[v]ery distinct pattern," which she associated with a beating. She said that the hospital staff "see[s] loop marks all the time."

Kisa Johnson, a special investigator for DCS, testified that the victim's case was referred to her through the child abuse hotline. She went to the hospital and visited the victim. The nurses showed her blisters on the victim's bottom. Ms. Johnson then spoke with appellant. Appellant told her that the victim had turned on the hot water by herself. Ms. Johnson testified that when she spoke with appellant, appellant was upset with the police officers but exhibited no other emotion.

Sheila Renice Arnold testified that she lived in the house where the victim was injured. The victim was staying at her house along with appellant and the victim's brother for a short time while appellant was in the process of getting an apartment. Mrs. Arnold testified that her son, Kelvin Arnold, Jr., was dating appellant at the time. Mrs. Arnold said that she used the bathtub in which the victim was injured daily and never had difficulty adjusting the water. In addition, she had bathed the victim in that bathtub and did not have difficulty keeping the child safe. Mrs. Arnold testified that the victim was "an average little two[-]year-old. Hyper and happy." The victim was toilet-training at the time of the incident and was wearing pull-up diapers.

Mrs. Arnold recalled that she was lying in bed with an illness on the day that the victim was injured and that her son had come into her bedroom to visit. She heard the victim squeal, and she characterized the squeal as sounding unhappy. The victim's brother came into the bedroom and told Mr. Arnold that appellant wished to see him. Two hours later, Mr. Arnold returned and told Mrs. Arnold what had happened to the victim. Mrs. Arnold testified that her house had one water heater, which was located in the attic. She had not had any work done on the water heater either before or after the victim was injured. Both the water heater and bathtub were in the same condition on the day that the police photographed them as they were when the victim was injured.

On cross-examination, Mrs. Arnold agreed that the water became hot very fast in her bathtub. She further agreed that Mr. Arnold had occasionally bathed appellant's children. She also said that in the two hours between Mr. Arnold's leaving her bedroom and returning to tell her about the victim's injuries, she did not realize that anyone had left the house.

Dr. Karen Lakin testified that she was an assistant professor of pediatrics at the University of Tennessee and that she was the medical director of LeBonheur's Child Advocacy Resource and Evaluation Services ("CARES") program. The court accepted her as an expert in pediatrics with a specialty in child abuse pediatrics. Dr. Lakin testified that she first saw the victim on the morning of April 27 before the victim's debridement treatment began. Dr. Lakin said that this was the best time for her to do a full assessment of the victim's injuries because the victim was under conscious sedation for her debridement treatment. Dr. Lakin testified that the victim "had very, very obvious burns to to her lower extremities and to . . . the perineal area, which is the genital area, and her buttocks area." The victim also "had some bruising in the form of . . . very linear loop marks on her thighs." Dr. Lakin characterized the victim's burns as "partial thickness burns," also known as "second degree burns where blisters or bullous start to form." Dr. Lakin said that the burns on the victim's right leg were greater than those on the left leg. The burns "completely encircle[d]" the victim's feet, ankles, and lower part of her legs. Dr. Lakin photographed the victim's injuries, and those photographs were published to the jury.

Dr. Lakin testified that she was present during the victim's debridement procedure. She explained that the dead tissue was removed, exposing the dermal layer. She further explained that it was a painful procedure because once the dead tissue was removed, nerve endings were exposed. Dr. Lakin testified that the victim was hospitalized for one month. She was in critical condition when Dr. Lakin first saw her because "[s]he was burned over about [twenty] percent of her body and she was just two years old." Dr. Lakin explained that "[b]urns are very, very dangerous and especially to young children because of the risk for infection." Illustrative of the dangers of infection, Dr. Lakin said that the victim became septic during her hospitalization and had to be transferred to the intensive care unit. Dr. Lakin testified, "[W]e consider this to be very life threatening." Dr. Lakin stated that the victim had to receive skin grafts on her right leg because her skin did not heal properly. In addition, she had to wear "compression garments to guard against scarring and . . . contractures," areas where the skin shrinks as it heals, which "can become a major debilitating complication." Dr. Lakin testified that the victim still experienced scarring as an inevitable part of her healing process. Dr. Lakin identified photographs of the victim's scarring as of the time of trial.

Dr. Lakin opined that based on the severity of the victim's burns, it "would be unlikely to have occurred by a two[-]year-old independently on her own." She said that the history of the injuries as documented by the emergency room physicians was not consistent with the pattern of burning. Dr. Lakin highlighted the fact that the victim had deep burns on both legs. She opined that "a child her age would have been able to get out if she was beginning to be burned unless . . . there was something preventing her from getting out and getting away." She explained that a child who is burned accidentally would generally only

be burned on one side rather than both. In addition, the depth of the victim's burns were significant because the depth of the burns was "related to the length of time that [the] tissue is exposed." Dr. Lakin testified that the victim "had very, very deep, extensive burns." Dr. Lakin opined, based on the burn pattern, that the victim's feet and perineum were in the water but that her knees were drawn up. She further opined that "if [the victim] [were] trying to move or trying to squirm, then that could explain how more of one side is going to get burned than the other." Dr. Lakin noted that the burn pattern did not match the history given to the emergency department — that the victim "was in the tub with water running and she was facing the water, the faucet" — because children burned by "water pouring down the front of them" would have injuries to the "anterior portion of the thighs[,] the perineal area[,] . . . [and] [t]he stomach, chin[], and shoulders."

Regarding the water temperature, Dr. Lakin opined that it would take more than a minute in 118-degree water for a partial thickness burn to result. She said that 118 degrees "would have been very uncomfortable" and opined that "there was something preventing her from getting away from that heat." Dr. Lakin testified that in her opinion, the victim's burns were non-accidental. She stated that in forming that opinion, she considered the loop marks "caused by a looped cord being struck on the skin"; the extensiveness of the burns on the victim's perineum because "[t]he perineum just does not get burned very easily by accident even in bathtub incidents"; the circumferential nature of the burns that indicated "an immersion," which "are non[-]accidental presentations for the most part"; the bilateral nature of the burning; and the length of time that it would take for burns to form when immersed in the hypothetical 118-degree water. Dr. Lakin agreed that it would have taken "sustained or prolonged exposure to the water" for the victim's burns to result. Dr. Lakin testified that part of the history given by one of the victim's family members "was that it was reported to [the family member] that the child had had a bowel movement after she had a bath and then was being cleaned up." This information was significant to Dr. Lakin because she had "many cases . . . where [she looked] for a stressful event that may have precipitated an abusive event."

On cross-examination, Dr. Lakin testified that her belief that the victim would have been able to exit the bathtub on her own came from being told that the victim was a typical two-year-old and her general pediatric knowledge of the developmental range of two-year-olds. She agreed that she did not know the temperature of the water at the time that the victim was burned but stated that she did not need to know the temperature to make the determination that the victim's injuries were non-accidental under the circumstances, including "the severity of the burn, the pattern of the injury, the coexisting bruising and loop marks, . . . the age of the child, and the possible predisposing inciting event of the bowel movement." Dr. Lakin said that the information about the possible bowel movement came from either the victim's aunt or grandmother. She agreed that these family members were

not present when the victim was burned.  Dr. Lakin also agreed that appellant "got the baby to the hospital in a relatively quick time."

Following Dr. Lakin's testimony, the State brought the victim before the jury to display her burns, essentially as demonstrative evidence.  Subsequently, the State rested its case-in-chief.  Appellant did not present evidence on her own behalf.

After the close of proof and deliberations, the jury convicted appellant as charged on all nine counts of the indictment.  The trial court merged[2] the convictions into one conviction for aggravated child abuse and sentenced appellant to serve twenty years in the Tennessee Department of Correction.  It is from this judgment that appellant now appeals.

## II. Analysis

On appeal, appellant contends that the evidence was insufficient to support her convictions.  Regarding her convictions for aggravated child neglect, she asserts that the State did not prove that appellant engaged in a continuing course of neglectful conduct.  For her other convictions, she argues that "the circumstantial nature of the evidence diminishes the strength of the proof and casts doubt on the verdict."

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011).  To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319.  This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d

---

[2] The judgment sheets for counts three through nine state that the *sentences* merged.  Therefore, we are remanding this case to the trial court for the court to clarify on the judgment sheets that the *judgments* merged.

832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

In this case, the State charged appellant with nine counts reflecting three separate factors under which a person may be convicted of aggravated child abuse, neglect, and endangerment: (1) aggravated child abuse (serious bodily injury); (2) aggravated child neglect (serious bodily injury); (3) aggravated child endangerment (serious bodily injury); (4) aggravated child abuse (deadly weapon); (5) aggravated child neglect (deadly weapon); (6) aggravated child endangerment (deadly weapon); (7) aggravated child abuse (especially heinous/torture); (8) aggravated child neglect (especially heinous/torture); and (9) aggravated child endangerment (especially heinous/torture). In addition, as evidenced by its closing argument, the State proceeded under two theories: (1) that appellant held the victim in the water; and (2) that appellant left the victim alone in the bathtub.

Tennessee Code Annotated section 39-15-402 provides the elements of aggravated child abuse, aggravated child neglect, and aggravated child endangerment:

> (a) A person commits the offense of aggravated child abuse, aggravated child neglect or aggravated child endangerment, who commits child abuse, as defined in § 39-15-401(a); child neglect, as defined in § 39-15-401(b); or child endangerment, as defined in § 39-15-401(c) and:
>
> (1) The act of abuse, neglect or endangerment results in serious bodily injury to the child;
>
> (2) A deadly weapon, dangerous instrumentality, controlled substance or controlled substance analogue is used to accomplish the act of abuse, neglect or endangerment;

(3) The act of abuse, neglect or endangerment was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim . . . .

When the child is under eight years old, the aggravated child abuse/neglect/endangerment offense is a Class A felony. *See* Tenn. Code Ann. § 39-15-402(b). Child abuse is defined as "knowingly, other than by accidental means, treat[ing] a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* § 39-15-401(a). Child neglect is "knowingly abus[ing] or neglect[ing] a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." *Id.* § 39-15-401(b). Child endangerment occurs when "[a] parent or custodian of a child eight (8) years of age or less . . . knowingly exposes such child to or knowingly fails to protect such child from abuse or neglect resulting in physical injury to the child." *Id.* § 39-15-401(c).

> Regarding the aggravating factors,
>
> "[s]erious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

*Id.* § 39-15-401(d). A deadly weapon in this context is "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(5)(B). The supreme court has held that an item under this section "will only be considered a deadly weapon if the defendant in a particular case actually used or intended to use the item to cause death or serious bodily injury." *State v. McGouey*, 229 S.W.3d 668, 674 (Tenn. 2007). "'Torture' is defined as 'the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious.'" *State v. Sims*, 45 S.W.3d 1, 16 (Tenn. 2001) (quoting *State v. Pike*, 978 S.W.2d 904, 917 (Tenn. 1998)). In addition, the supreme court adopted the following definitions for heinous, atrocious, and cruel:

> Heinous—"Grossly wicked or reprehensible; abominable; odious; vile."
>
> Atrocious—"Extremely evil or cruel; monstrous; exceptionally bad; abominable."
>
> Cruel—"Disposed to inflict pain or suffering; causing suffering; painful."

*State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985) (quoting *American Heritage Dictionary of the English Language*).

Viewed in the light most favorable to the State, the evidence at trial showed that the appellant placed the victim in a bathtub and that the two-year-old victim was in bath water hot enough to scald for long enough to cause partial thickness burns over twenty percent of her body. The testimony presented at trial indicated that the victim was in excruciating pain that was difficult to control with medication, that she was hospitalized for a month, that she underwent multiple procedures and surgeries, and that she has permanent scarring as a result of her injuries. Dr. Lakin testified that the victim had to have been held in the water for her not to have exited the bathtub on her own. However, appellant's story was that she merely left the victim alone in the bathtub for five minutes and that the victim turned on the hot water herself. The State presented both versions to the jury, and together, these two versions account for the nine separate counts.

Appellant has not contested the sufficiency of the evidence regarding the aggravating factors — serious bodily injury; use of a deadly weapon; and that the act was especially heinous, atrocious, cruel or involved torture. Nonetheless, our review of the evidence indicates that there was sufficient evidence to prove these factors. The victim's serious bodily injury was partial thickness burns to twenty percent of her body. The scalding water, because it actually caused serious bodily injury, was a deadly weapon. Finally, under either theory posed to the jury, by allowing or forcing her two-year-old daughter to be in scalding water long enough to cause the burns sustained by the victim, appellant caused pain and suffering to the victim at a level that was especially heinous, atrocious, and cruel. Thus, for each conviction, we conclude that the evidence supports the relevant aggravating factor.

The question remains whether appellant's conduct amounted to child abuse, child neglect, and child endangerment. Regarding the three aggravated child abuse convictions, the evidence was sufficient for any rational jury to find beyond a reasonable doubt that appellant purposefully held the victim in the water and that this conduct resulted in injury to the victim.

The evidence was also sufficient to support the three aggravated child neglect convictions under the alternate theory that appellant left the victim alone in the bathtub for five minutes.[3] Appellant's leaving the two-year-old victim alone in a bathtub in which the water became hot very fast adversely affected the victim's health by causing her to be severely burned. Appellant's argument that the State did not prove a continuing course of

---

[3] We note that the verdicts are arguably inconsistent. However, "[c]onsistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment." *Wiggins v. State*, 498 S.W.2d 92, 93-94 (Tenn. 1973); *see also State v. Marlo Davis*, No. W2011-01548-CCA-R3-CD, 2013 WL 2297131, at *11 (rejecting the application in Tennessee of the mutually exclusive verdicts doctrine), *perm. app. granted* (Tenn. Nov. 13, 2013), *argued* (Tenn. Nov. 11, 2014).

neglectful conduct is unavailing because the State does not have to prove that appellant continually neglected the victim, only that she neglected the victim so as to adversely affect the child's health and welfare. The case law she cites in support for her argument in this regard, *State v. Adams*, 24 S.W.3d 289, 296 (Tenn. 2000), is inapposite because it concerns whether there must be an election of offenses when the neglectful conduct spans a period of time. Moreover, appellant's actions in immediately seeking medical help for the victim does not serve to negate her neglectful conduct.

Finally, the proof at trial supported appellant's convictions for aggravated child endangerment because the proof showed that appellant was the victim's parent, that the victim was under eight years old, and that appellant either knowingly placed the victim in a position to be burned, under Dr. Lakin's theory, or that she failed to protect the victim from being burned, under her own version of events. Therefore, appellant's arguments are without merit, and we affirm the merged judgment of conviction for aggravated child abuse.

## CONCLUSION

Based on the record, the briefs of the parties, and the applicable law, we affirm the judgment of the trial court. However, we remand this case to the trial court for it to clarify on the judgment sheets that the judgments merged, not merely the sentences.

_____
ROGER A. PAGE, JUDGE